IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
January 23, 2020 Session

## IN RE: ISABELLA W.

**Appeal from the Juvenile Court for Knox County**
**No. 147106   Timothy E. Irwin, Judge**

_____

### No. E2019-01346-COA-R3-PT

_____

A father appeals the termination of his parental rights to his daughter, asserting that the evidence did not establish the three grounds upon which termination was based and that termination was in his child's best interest.  He also argues that he is entitled to a new trial due to ineffective assistance of his trial counsel, the denial of a continuance in order that he could represent himself, and that the court erred in not finding that he was competent to stand trial.  Upon our thorough review, we conclude that the father received fundamentally fair procedures; that he waived the issues related to the continuance and his competence to participate in the trial; we reverse the court's holding with respect to one ground, affirm the rest, and affirm the termination of his rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed in Part and Affirmed in Part; Case Remanded**

RICHARD H. DINKINS, J., delivered the opinion of the court.  D. MICHAEL SWINEY, C.J., filed an opinion concurring in part and dissenting in part, in which THOMAS R. FRIERSON, II, J., joined.

Gregory E. Bennett, Seymour, Tennessee, for the appellant, Aaron D. W.

Herbert H. Slatery, III, Attorney General and Reporter; Jeffrey D. Ridner, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

### OPINION

### I.   FACTUAL AND PROCEDURAL HISTORY

Isabella W. was born to Kimberly ("Mother") and Aaron W. ("Father"), in June 2011.  In April 2014, Father attacked Mother in the family's home and was later convicted of aggravated assault and sentenced to eight years of incarceration.  On April

30, 2014, the Department of Children's Services ("DCS" or "the Department") filed a petition in Knox County Juvenile Court alleging that Isabella was dependent and neglected and at immediate risk of abuse or neglect if allowed to have contact with Father, and requesting an order restraining father's contact with her; a restraining order was entered *ex parte* on May 1, and on August 26, after a hearing at which Father did not appear because of his incarceration, the court entered an order holding that Father would have no contact with Isabella and imposing requirements on both parents. Mother was required to ensure that Isabella had no contact with Father and to complete domestic violence counseling. Father was required to undergo alcohol and drug and mental health assessments; participate in anger management and domestic violence counseling; abstain from drug use; resolve all legal issues and not incur any additional misdemeanor or felony criminal charges; and file a petition for supervised visitation in order for the court to consider any modification to the no-contact order.

Isabella remained in Mother's custody until Mother was arrested on September 1, 2017, for possession of drug paraphernalia, possession of drugs, and being in possession of a stolen vehicle. Because Isabella was with Mother at the time of her arrest, the police contacted DCS, whose representatives immediately filed a petition to have Isabella placed in protective custody and to have her adjudicated dependent and neglected. Isabella entered foster care that day, and a protective custody order was entered the following day, awarding DCS temporary legal custody of Isabella. A hearing was held on September 6 at which the court found probable cause that Isabella was dependent and neglected, and an adjudicatory hearing was held on October 18; both parents appeared at the adjudicatory hearing. The court entered an order following the hearing adjudicating Isabella to be dependent and neglected, finding that "Mother stipulates that she failed a drug screen and obtained criminal charges[; t]he father stipulates that there is a no contact order out of Knox [County]." The court also found that "based on an assessment of the family and the child[ren]'s circumstances, it was reasonable to make no effort to maintain the children in the home."

Permanency plans were developed on September 20, 2017 and July 9, 2018; both were ratified by the court. The September 20 plan had dual goals of "return to parent" and "exit custody with relative." The Statement of Responsibilities included requirements that Father "contact the Department and provide any and all documentation of anything completed or required to do from prior cases"; attend a parenting assessment and follow any recommendations; schedule and attend parenting classes; "obtain and maintain safe stable housing free from any illegal activity . . . document[ed] . . . in the form of rent receipts, lease, or mortgage receipts"; "obtain and maintain a legal source of income"; schedule and attend a mental health assessment, provide the assessor with a copy of the permanency plan, sign all releases, and follow any recommendations; remedy any legal issues, follow rules of parole, and not incur any new changes; "schedule and attend anger management classes in the event he has not already done so since the last episode with Kimberly"; schedule and attend an alcohol and drug assessment; "submit to

and pass random drug screens, provide the department with printouts of any prescribed medications, and pass all pill counts"; attend all scheduled appointments in order to remain responsive to Isabella's well-being; "think about any and all friends and family who may be able to become a resource/team member to assist the family; and provide the Department with copies of a valid driver license, car insurance, and registration if transporting Isabella. The July 2018 plan retained the same requirements, and modified the goals to "return to parent" and "adoption."

On December 20, 2018, the Department filed a petition to terminate Father's parental rights to Isabella. As grounds, the petition alleged that Father had been incarcerated during a portion of the four months preceding the filing of the petition and, prior to his incarceration, had engaged in conduct exhibiting a wanton disregard for Isabella's welfare; that he had failed to substantially comply with the responsibilities set forth in the permanency plans; and that he had failed to manifest an ability and willingness to personally assume legal and physical or financial responsibility of Isabella and placing her in his custody would pose a risk of substantial harm to her physical and psychological welfare. The petition also alleged that termination was in Isabella's best interest.

A trial was held on June 13, 2019 at which Mr. Chris Ramos, case worker for DCS, and Father testified.

Mr. Ramos testified that he was Isabella's foster care case manager and that she entered foster care in September 2017 after her mother was found to have been in possession of drug paraphernalia and a stolen vehicle and tested positive for drugs; that Isabella's mother could not name other relatives who could take custody of Isabella; that a no contact order was in effect which prevented Father from being around Isabella due to Father's assault of Mother in April 2014; that Father was sentenced to serve eight years of incarceration for his conviction of aggravated assault of Mother in 2014[1] and was paroled in May 2016; that Father was "excited" about regaining contact with his daughter; that Father "continuously pushed me with regard to getting the certificates" of completion of courses Father had enrolled in while incarcerated to show what steps he had taken with regard to the permanency plan; that Father was arrested in November 2017 for violating his parole by testing positive for methamphetamines; that Father was released on parole again in October 2018; that Father was reincarcerated for violating his parole by failing to report to his parole officer and not residing at the address he gave his parole officer; and Mr. Ramos agreed with the statement that "[d]espite the programs [Father] took before, he still continued to use drugs, he still continued to engage in

---

[1] In addition to Mr. Ramos' testimony, the judgment was entered as an exhibit showing that Father pled guilty on June 30, 2014 to felony aggravated assault as a multiple offender and was sentenced to eight years in the Tennessee Department of Corrections.

criminal activity."

With respect to the permanency plan, Mr. Ramos testified that Father did not participate in the development of the plan but was later given a copy of the plan, and indicated he agreed with and signed it on October 18, 2017; and that the responsibilities of the plan were "for Father to provide [DCS] with documentation of legal stable income, legal stable housing, an A&D assessment, mental health assessment, to follow any and all recommendations from those, to comply with random drug screens, parenting classes . . . [a] transportation plan, [and] to maintain contact with DCS." He testified that Father "completed a GIRTH,[2] . . . an outpatient program, while he was in prison[; t]here's 150 hours total that was given to him during that program, . . . [including:] 60 hours of substance use, 32 hours of victim impact, 12 hours of anger management, 30 hours of relapse prevention, 16 hours parenting skills, equaling to 150 hours total." He testified that the court had found that Father was not in substantial compliance with the permanency plan[3] and further testified as follows:

> Q. After that court finding, did the father ever ask you what he needed to do to get into compliance?
> A. He asked me what is it that I need to do, and I said you need to complete the permanency plan, and he said, well, I've already completed most it because of the program that I was in. I said that's not going to be enough, I need you to do -- and I listed everything else out again.
> Q. Besides the one drug test when did you give that to him?
> A. I believe it was the day of court. It was given to him 10-18-18.
> Q. After that drug test, did you have an opportunity to drug test him again?
> A. No.

Mr. Ramos also testified that Father provided documentation of the property taxes he had paid on the home Mother and Father owned, did not provide documentation of employment, but did provide documentation from several programs he completed while incarcerated prior to Isabella coming into protective custody.[4] He also testified that in

---

[2] Exhibits entered at trial reflect that the program was titled "GRTH/Out-Patient."

[3] The Permanency Hearing Order, dated October 18, 2017, and entered as an exhibit at trial, states that the court found that Father was not in substantial compliance with the provisions of the permanency plan.

[4] Mr. Ramos testified that Father provided him with documentation of an October 2014 "Pro Social Life Skills Program," a May 2016 "Eat Smart, Get Your Family to the Table Program," two programs from August 2016-- Residential Drug Abuse Program and Spiritual Principles Program, and a "You Have the Power, Know How to Use It" victim impact program from August 2015, and anger management programs, for which no date was given. Later testimony and the certificates of completion entered into evidence show that almost all of the courses were completed before Isabella came into protective custody. Mr. Ramos also testified that Father participated in the following programs:

October 2018, Father was in "constant communication" with him, but "towards the end of November 2018, maybe the first week of December 2018, that's where we lost contact." Mr. Ramos testified that he was not able to communicate with Father and did not know his whereabouts. He also gave the following testimony about their last interaction:

> Q. . . .What else would you want him to do to address the parenting component of the permanency plan?
> A. A parenting assessment. He has not seen this child, I believe, since she was around three years old.
> Q. Have you scheduled such an assessment for him?
> A. I asked him to let me him help him set up those assessments, parenting, A&D, get a parenting assessment done. I was sitting outside of his house when he asked me to come see his home to do a home check, and when I came to the home, he reported that it still wasn't ready, so we talked outside at the home about those things. I said let me know what you need me to help you do, I'm willing to help you do it all, but I just need to know which ones you want to start knocking out first.
>
> He said, okay, let me get back to you, I'm in the middle of switching a job. And then at that point, that was when I went to his home, I believe that was late November, and I haven't heard from him since.
> Q. Late November of 2018?
> A. This year -- 2018.
> Q. So at that point in time you discussed with him but nothing was ever set up?
> A. Correct.

Mr. Ramos testified that during that November 2018 interaction, he told Father that he needed to attend "six or eight weeks of domestic violence courses." With respect to the condition of Father's home, Mr. Ramos testified:

> The whole house concerned me. There was no electricity on, no running water, is what he reported. The front door was standing wide open, there

---

FocusGroup Prison Ministries, Fatherhood and Character Building Initiative[, . . .] Financial Management, Responsible Thinking, Relapse Prevention, Inside Out Dads, Character Group Study, Travelers Gift, Change Plan, Managing the Life, Personal Growth, Keys to Success, Speech Craft and Fitness for Life, and that was completed June 5, 2015.

When Mr. Ramos was asked about Father's parenting classes, after acknowledging that Father had "gotten 16 hours this time around with some additional classes that he did in 2015, '16," he stated that "I told [Father] that due to when the[se certificates of completion] were given to him and the date of when Bella entered custody, it was not going to be enough."

wasn't a door -- well, there was a door, but it wasn't attached correctly. There were wires laying around outside. The grass had grown so tall, it was probably to my knees at that point.

Mr. Ramos testified that Isabella "is in a Level 1 DCS home, she's doing well, she loves gymnastics, she's very much a studious child, she absolutely loves school, she does really, really well in school." He also testified that she is one of the "spunkiest" kids he'd ever met and is "really quick witted." He testified that she had been going to counseling and just started with a new therapist. With respect to Isabella's current placement, which she has been in for more than a year, Mr. Ramos testified that she is in a two-parent foster home with one other child, whom Isabella "[g]ets along really well with"; that the foster parents "have a big house" and "are very active in the community," and that Isabella "plays all types of sports." He testified that the foster parents are willing to adopt Isabella if she were to become available for adoption.

Father testified that he pled guilty to aggravated assault and was sentenced to serve eight years.[5] Father testified that he underwent drug treatment while incarcerated in 2015 and 2016 and then when he got out of prison on parole, he "went into a 90-day live-in program" in August 2016 called the Spiritual Principles Program and "came to the court at that time and I brought all of my certificates and was trying to have the mother served so I could get my rights started back for visitation…" He also testified that he thought the certificates of completion were sufficient to get visitation started and that Mr. Ramos never told him specifically what additional things he needed to do. Father testified that when Isabella was taken into DCS custody that he "was willing to come in and do drug tests for them . . . , but . . . they were trying to make me go through all of this other stuff because of the fact that she had already been in the system for 30 days[.]" Exhibits entered at trial show that Father completed a program titled "Group Therapy for Substance Use Disorders (Intensive Outpatient)" on October 4, 2018, and on that same day, also completed the GRTH/Out-Patient program. Father testified that he was due to start another program the following month that was tailored to individuals who have a history of violence or domestic violence and involved 360 hours of training and education in subjects such as parenting, anger management, and victim impact.

With respect to the violations that resulted in the 2018 revocation of his parole, Father testified that "the only thing [he] was picked up for [was] failure to report," not failure to reside at the address he had given his parole officer as Mr. Ramos had asserted. He testified that he would be "going up for parole in March of 2020," but would "flatten

_____

[5] The judgment entered as an exhibit for the aggravated assault states that Father was a multiple offender. Father testified that he had two prior felony convictions: gross negligent vehicular manslaughter in June 2008 "along with a felony hit and run," for which he served a year and a half in California, and "tak[ing] a vehicle without [the] owner's consent" in March 2001. As these offenses were committed prior to the conception or birth of Isabella, we do not consider them in our analysis of the grounds for termination of Father's parental rights; they are matters we consider in our review of the best interest factors.

[his sentence] in May of 2020 instead, and . . . I won't have to answer to parole anymore. The only person I'll have to answer to then will be DCS if [Isabella] was still in their custody." Father testified that he anticipated being released from incarceration in May or June 2020; that he could provide a stable home for Isabella within a six- to ten-month period of being released; that he was working during his parole in 2018 and had two jobs ready for him upon his release from incarceration; and that he was working to get his driver's license back, which would require him paying $500. Father testified as follows regarding Mr. Ramos' visit in November 2018 while Father was on parole:

Q. When he came out, you stated he wasn't in your house, but you testified that you were talking to him outside?
A. He stayed at the top of my driveway, sir.
Q. So he didn't come on foot on the property?
A. No, he did not.
Q. Was that your choice or his choice?
A. He asked if he could do an inspection of the house at that time, which I had no visitation that was going on with my daughter at that time, so I kinda felt it was irrelevant, and being that I just got back to my house after being out of prison and people had destroyed my house while I was away, I chose not to let him come in my house and inspect it at that point because there really wasn't no sense in it when I wasn't even having no visitation with my daughter at that point.

Regarding his relationship with his daughter, Father testified that he loves Isabella, whom he called "[his] baby, . . . [his] only child," that he has addressed his domestic violence issues by attending a class and had "never spanked my daughter, never put my hands on my daughter," that Isabella still has memories of him, and that he could properly parent her. He also testified as follows:

I would like to state for the record, [Mother] did bring Bella to visit me in prison. [Mother] did let me talk to Bella the whole time I was in prison on the phone, and we communicated by letters. And I supplied every diaper, every bottle, and that was my baby. She knows who her daddy is. The last worker, whatever her name is, she personally told me, she brought a picture of her and me asking if she knew where her daddy was. So I think it's really, it's really – it's cruel that they have been keeping us from each other all of this time when I've tried to do everything to uphold everything the court has asked of me.

The trial court entered an order on July 1, 2019, terminating Father's rights on the grounds of abandonment by engaging in conduct exhibiting a wanton disregard for Isabella's welfare, substantial noncompliance with the permanency plan, and failure to manifest an ability and willingness to assume custody and after determining that

terminating Father's rights was in Isabella's best interest.

Father appeals, challenging the grounds for termination and the best interest determination; in addition, he contends that he received ineffective assistance of counsel at the trial, that the court erred in denying him a continuance after notifying the court that he desired to represent himself, and that the court erred in not finding him to be incompetent at the time of trial due to not receiving his medication.

## II. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). However, that right is not absolute and may be terminated in certain circumstances. *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982); *State Dep't of Children's Serv. v. C.H.K.,* 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, courts must apply a higher standard of proof when adjudicating termination cases. *Santosky*, 455 U.S. at 766–69. A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and convincing evidence that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Tennessee law ensures fundamental fairness in termination proceedings by requiring a heightened standard of proof—clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1); *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016). In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, "as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements" necessary to terminate parental rights. *Id.* In this regard, clear and convincing evidence is "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence" and which "produces a firm belief or conviction in

the fact-finder's mind regarding the truth of the facts sought to be established." *In re Alysia S.,* 460 S.W.3d 536, 572 (Tenn. Ct. App. 2014) (internal citations omitted).

## III. ANALYSIS

### A. Preliminary Matters

Father argues that he should be given a new trial due to the ineffective assistance of counsel he received because he was "temporarily incompetent to stand trial" as a result of not taking his medication, and because he failed to receive a 90-day continuance after notifying the court of his desire to dismiss his attorney and defend himself *pro se*. We address these issues first.

Father argues that he received ineffective assistance of counsel. In his brief, he states that "he was unable to reach his attorney by telephone and that the two never met to prepare prior to the termination hearing." He does not cite to any portion of the record to support this statement; rather he references two pages in a document filed with this Court after the termination order was entered, styled "Appeal in regards to Terminating Parental Rights and Guardianship," which this Court treated as his notice of appeal. On the cited pages, Father states that his attorney "never returned any of [Father's] phone calls before [Father's] incarceration or after [. . . and] had no contact with [Father] to prepare for the termination of parental rights hearing." He concludes this document by stating that he was "complaining of ineffective assistance of counsel and prosecutorial misconduct . . . [which should] be enough reason for this appeal to be granted and effective counsel be given to Petitioner to stand his ground of appeal of termination of parental rights."

The question of whether a parent whose parental rights are sought to be terminated has the constitutional right to the effective assistance of counsel was before our Supreme Court in *In re Carrington H.*, 483 S.W.3d 507, 533-34 (Tenn. 2016) *cert. denied sub. nom. Vanessa G. v. Tenn. Dep't of Children's Servs.*, 137 S. Ct. 44 (2016). In declining to hold that there is such a right, the court considered the substantial safeguards inherent in the statutory and evidentiary standards applicable to termination of parental rights cases, and held that the gravity of the rights at issue and the higher standard of proof entitle the parent to a procedure that is fundamentally fair, consistent with due process principles. *Id*. at 526-36. Consequently, the Court in that case analyzed the parent's claim of ineffective assistance of counsel determining whether the actions of counsel prevented the parent from receiving a fundamentally fair proceeding; we shall do likewise.

Shortly after the termination petition was filed, Father filed a pleading stating his objection to the termination proceedings and requesting counsel be appointed for him; in

accordance with Tennessee Code Annotated section 37-1-126(a)(2)(B)(ii), the court appointed counsel, who filed a response to the petition on Father's behalf. In that response, in addition to the typed provisions drafted by the attorney, Father made handwritten notes further explaining his position with respect to the requirements of the permanency plan and his position that the DCS representative made inconsistent statements. It is readily apparent from the response that Father and his counsel had some contact, at a minimum by mail, prior to the hearing, such that Father was able to record his commentary on the response and sign it before counsel filed it with the court. Moreover, Father was present for the trial, and the transcript shows that he spoke out during the proceedings even when he was not on the witness stand and engaged in dialogue with the court.[6] At no point did Father present any concerns he had about his attorney's representation to the court.

The record also shows that Father's counsel engaged in thorough cross examination of the witnesses, objected to some questions asked by the other attorneys as well as to answers given by Mr. Ramos, conferenced with his client before concluding his cross examination, and asked questions that permitted Father to testify at length as to his position on Isabella's best interest, his impressions of how DCS mishandled the case, and what steps Father had taken to address the requirements imposed on him during Isabella's time in protective custody. We see no merit in Father's contentions, as there is no evidence in the record to show that Father was denied a fundamentally fair proceeding consistent with requirements of due process or that a failure to meet in person prevented his trial counsel from effectively advocating for him.

With respect to Father's contention that the trial court erred by not allowing him a 90-day continuance to prepare for his own defense "after Appellant notified the court of his desire to dismiss his attorney and pursue a defense . . . *pro se,*" we quote the entirety of the argument in his appellate brief:

> The Father further argues that after sending the Juvenile Court Clerk's office a letter firing his counsel, the trial court should have granted the Father a ninety (90) day extension to allow the Father to represent himself in the proceeding. Yet the trial Court failed to even inquire as to whether the Father was satisfied with the services of his attorney. (TR, pp. 49-50). For the reasons stated in Section IV [pertaining to his claims of ineffective assistance of counsel] above, the Father argues that this failure was a violation of his constitutional and statutory rights and that the Father should be awarded a new trial.

---

[6] For example, after the proof was completed and the trial court had rendered an oral ruling, Father engaged the court in a colloquy about whether or not he would be permitted to have lunch before being transported back to prison.

Father's statement of this issue and his argument mischaracterize the record, which does not contain a letter dismissing his counsel. We have reviewed the transcript and it does not show that Father brought to the court's attention that he had purportedly dismissed his attorney or that he wanted to proceed *pro se*.

The order appointing counsel states that the attorney was appointed "[f]rom the filing of the termination of parental rights petition to the conclusion of trial"; the termination order relieves "[a]ll appointed attorneys . . . of further responsibility in this matter." The record also contains a subsequent order, entered on July 31, appointing counsel to represent Father in this appeal. Father was represented throughout the hearing, and he never told the trial court that he wished to proceed *pro se*; the first such statement is contained in a letter he wrote to this Court post-trial. From our review of the record, Father had effective representation at all times; he has failed to show any prejudice by being unrepresented during the brief period between the conclusion of the trial and the appointment of counsel for this appeal. The record makes clear that Father did not raise any issue in the trial court with respect to a continuance, a matter that would have been within the trial court's sound discretion. *State Dep't of Children's Servs. v. V.N.*, 279 S.W.3d 306, 317 (Tenn. Ct. App. 2008). Issues not raised in the trial court are waived on appeal. *Black v. Blount*, 938 S.W.2d 394, 403 (Tenn. 1996) ("Under Tennessee law, issues raised for the first time on appeal are waived.").

Father next argues that his due process rights were violated when he was "denied his medications Seroquel and Effexor," "without [which], he would have been temporarily unable to function in a manner consistent with the ability to properly defend himself." Father contends that "[b]y failing to inquire as to the Father's prescribed medications and whether he was being dispensed such medication the trial court failed to protect the Father's due process rights as required." There is no evidence in the record that Father ever presented to the trial court his need for his medication or his asserted incompetence to participate in the trial if he did not take it; the first reference touching on this matter is in the July 20 letter to this court initiating the appeal. Again, issues not raised in the trial court are waived on appeal. *Black*, 938 S.W.2d at 403.

## B. Grounds for Termination

### 1. Abandonment by Engaging in Conduct that Exhibits Wanton Disregard

Tennessee Code Annotated section 36-1-113(g)(1) provides that abandonment of the child by the parent, as defined in section 36-1-102, is a ground for termination; in turn, section 36-1-102(1)(A)(iv) defines abandonment, in pertinent part, as follows:

> A parent or guardian is incarcerated at the time of the institution of an
> action or proceeding to declare a child to be an abandoned child, or the

- 11 -

parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or *the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.*

(Emphasis added.)  This Court stated in *In re Audrey S.*:

[The above statutory definition] reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child. Incarceration severely compromises a parent's ability to perform his or her parental duties. A parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child. However, parental incarceration is not an infallible predictor of parental unfitness. . . the parent's incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child.

182 S.W.3d 838, 866 (Tenn. Ct. App. 2005).  The termination petition was filed on December 20, 2018, and it is undisputed that Father was incarcerated from November 2017 until October 2018 and from November 2018 through the time of the trial.

As to this ground, the trial court found:

Respondent has engaged in conduct that exhibits a wanton disregard for the child's welfare by: engaging in parole violations; substance abuse, including methamphetamine use; failure to provide appropriate care and support for the child; engaging in criminal activity including the aggravated assault of this child's mother. Respondent was drug tested on November 2, 2017, while on parole, and was positive for methamphetamine. Respondent was arrested for violating the terms of his parole on November 27, 2017, and was returned to prison for his use of methamphetamine. Respondent remained incarcerated until he was released on parole again on October 12, 2018. Respondent was subsequently arrested for violating the terms of his parole again by failing to report and by failing to reside at the address he had reported to his parole officer.

Father does not argue that the evidence preponderates against these findings, and from our review of the record, we conclude that they are supported by a preponderance of the evidence.[7]

Father argues that "his actions did not rise to a level of 'wanton disregard' as defined by statute and as interpreted by this Court." He cites his completion of a program in October 2018 that included sixty hours of substance abuse education and thirty hours of relapse prevention and that he would be attending an additional class that required 360 hours of training and education in subjects such as parenting, anger management, and victim impact to show that he has not, in fact, abandoned Isabella within the meaning of the statute.

Father's arguments and the evidence he cites focus on his behavior and steps taken while incarcerated; this ground for termination, however, focuses on Father's behavior *prior* to incarceration and seeks to determine whether a there is a pattern of conduct shown that exhibits a disregard for Isabella's welfare. In this regard, the evidence shows that the conduct resulting in his 2014 incarceration was that he pushed Isabella's mother to the ground, threatened to kill her, attempted to strangle her, and held a pocket knife against her neck in their home where Isabella resided. Despite completing many hours of substance abuse education while incarcerated in 2014 and 2015, Father continued to use drugs once paroled in 2017, specifically methamphetamine, resulting in a positive drug screen that caused him to be reincarcerated. While on parole again in 2018, Father failed to comply with the terms of his parole and was again reincarcerated. Father's actions when not incarcerated clearly show a pattern of criminal and reckless conduct and a disregard for the effect his behavior may have on Isabella's well-being; it exhibits a "broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *In re Audrey S.*, 182 S.W.3d at 866. The evidence is clear and convincing that Father abandoned Isabella by engaging in conduct that exhibits a wanton disregard for her welfare within the meaning of section 36-1-102(1)(A)(iv), and affirm the holding of the trial court in that regard.

## 2. Substantial Noncompliance with the Permanency Plans

The statute setting forth the ground of "substantial noncompliance" reads: "There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4." Tenn. Code.

___

[7] Father and Mr. Ramos gave conflicting testimony as to the circumstances of his 2018 parole violation; Father insisted at trial there was no evidence that he was not residing at the correct address and that he was not reincarcerated on that basis. While the evidence conflicts as to whether there were two violations or one that caused him to be arrested, the result is the same: Father was reincarcerated for failing to comply with the terms of his parole. Elsewhere in the order, the trial court only refers to Father's failure to report as the cause of his 2018 parole violation and reincarceration.

- 13 -

Ann. § 36-1-113(g)(2). In *In re C.M.*, this Court said that, DCS must show the following to prove this ground:

> [T]hat the permanency plan includes a "statement of responsibilities" that "clearly communicate[s] to the parent: 'this is what you must do to regain custody of your child.'" . . . DCS must also show that the permanency plan's requirements are "reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." . . . Further, DCS must demonstrate that "the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met."

No. E2018-02108-COA-R3-PT, 2019 WL 3812421, at *4-5 (Tenn. Ct. App. Aug. 14, 2019) (internal citations omitted). We have held that the noncompliance with the permanency plan does not have to be willful to support the termination of the parent's rights. *In re Joseph L.*, No. M2011-02058-COA-R3-PT, 2012 WL 2389609, at *9 (Tenn. Ct. App. June 25, 2012).

With respect to the whether the requirements of the plan are reasonable and related to remedying the conditions that caused the child to be placed in protective custody, Father argues on appeal that "the no contact order between him and the Child was the only impediment to the Father obtaining custody of the Child." The no contact order was put in place during the 2014 dependency and neglect proceedings and remained in effect through the time of the termination hearing because Father had not petitioned to have it removed.[8] Moreover, the no contact order was referenced in the permanency plans, and

---

[8] Mr. Ramos testified as follows:

> Q. I'm looking at the final order that was entered by this court, Magistrate Joseph. It was a hearing on July 29, 2014, it was entered August 26, 2014. It's a previous D&N case concerning domestic violence in the home. In that order it says that he must complete certain requirements in order to modify the no contact order?
> A. Correct.
> Q. Those include A&D assessment, mental health assessment, anger management counseling, domestic violence counseling, abstain from drug use, resolve legal issues and not incur any additional misdemeanor or criminal charges, and he shall file a petition with the court to modify?
> A. Correct.
> Q. Are you aware of the father ever filing a petition with the court to modify that no contact order?
> A. No.
> Q. In fact, he did not abstain from drug use because he was using methamphetamine three years later?
> A. Right.
> Q. And he has not resolved his legal issues; in fact, he's still in prison today?
> A. Correct.

many of the requirements to have the no contact order lifted and the obligations of the permanency plan were the same, including the need for alcohol and drug assessment and a mental health assessment. The permanency plans included the additional requirements that Father attend a parenting assessment, as well as parenting classes, that he obtain and maintain safe and stable housing, follow the rules of parole, and not incur any new charges. These conditions address the fact that Father had not been around Isabella in nearly five years and that he would eventually need to provide a safe and stable home for her. We conclude, as did the trial court, that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused Isabella to come into custody.

As to the second element, while the evidence shows that Father participated in and completed several programs while he was incarcerated prior to Isabella coming into DCS custody, it also shows that he was arrested and reincarcerated due to a positive drug screen for methamphetamine while on parole, despite having completed these programs.[9] Father completed another program in October 2018 entailing 60 hours of substance use, 32 hours of victim impact, 12 hours of anger management, 30 hours of relapse prevention, and 16 hours of parenting skills; he also completed "Group Therapy for Substance Use Disorders (Intensive Outpatient)" in October 2018. While participation in those classes is evidence of positive progress with the requirements of the permanency

---

Q. The other requirements are basically the same thing that was on the permanency plan, correct?
A. Correct.

[9] The unrebutted testimony of Mr. Ramos supports the finding of the trial court that:

Respondent and DCS were able to make contact after respondent's release. DCS made reasonable efforts to assist Respondent to complete his requirements under the plan. DCS referred or otherwise provided opportunities for the following: alcohol and drug assessment, mental health assessment, parenting assessment, ongoing case management, and appropriate care and supervision of the child. The DCS case manager explained to Respondent that he would need to complete the items on the permanency plan again since additional concerns arose after he completed those classes in prison; specifically, he relapsed into using methamphetamine, demonstrated poor parenting skills by violating his parole and had not addressed potential mental health needs. Respondent did not complete the requirements under the plan.

***

DCS was able to confirm that Respondent did participate in a variety of programs while he was in prison. The Court received in evidence copies of the certificates of completion for said programs. *Respondent, however, has not demonstrated that he has learned any new behaviors or skills in these programs. Respondent continued to use drugs while out on parole[.]*

(Emphasis added.)

plans, Father was required to complete more than just the drug abuse assessment and follow-up education; he also needed to complete a mental health assessment and a parenting assessment. Mr. Ramos testified that he told Father he was "willing to help [him] do it all, but [he] just needed to know which ones [Father] wanted to start knocking out first"; that Father told him that he was in the middle of starting a new job and would get back to Mr. Ramos; and that he did not hear from Father again.

Notwithstanding the courses Father completed while incarcerated, he lacked completing a mental health assessment and a parenting assessment, as well as maintaining safe and stable housing. The failure to comply with these provisions, each of which was particularly important in light of the circumstances that prevented Isabella from being placed in his custody in the first place, render Father's noncompliance substantial. *See In re C. M.*, 2019 WL 3812421, at *4-5. We therefore affirm the trial court's holding that this ground was established by clear and convincing evidence.

### 3. Failure to Manifest an Ability and Willingness to Assume Custody

Tennessee Code Annotated section 36-1-113(g)(14) provides that a parent's rights may be terminated where:

> [a] parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

This ground requires the party seeking termination of a parent's rights to prove two elements by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1), (g)(14). First, the party must prove that the parent failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). Second, the party must prove that placing the children in the parent's "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14).

The manner in which the statute is to be interpreted in establishing the first element of this ground has generated a lack of consensus within this Court, as noted in the case of *In re Zaylee W.*:

> There is a split in authority regarding the proof required to establish the first prong of the analysis. In *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *12-15 (Tenn. Ct. App. June 20, 2018), a panel of this Court addressed the first prong by engaging in a complicated

- 16 -

use of statutory construction and grammar rules to essentially conclude that the General Assembly's use of "and" in the phrase "an ability and willingness" actually means "or." Some panels of this Court have followed the decision in *In re Amynn K.* and concluded that a party is not required to prove a failure to manifest both a willingness and an ability to assume responsibility of the child. *See In re Jayda H.*, No. E2019-00855-COA-R3-PT, 2019 WL 6320503, at *9 (Tenn. Ct. App. Nov. 25, 2019) (stating that "consistent with the discussion in the *In re Amynn K.* decision, we do not view a parent's demonstration of 'willingness' as fatal to this ground when accompanied by a failure to manifest the requisite 'ability' "); *see also In re Nevaeh B.*, No. E2019-01539-COA-R3-PT, 2020 WL 1527001, at *10-12 (Tenn. Ct. App. Mar. 26, 2020); *In re Serenity S.*, No. E2019-00277-COA-R3-PT, 2020 WL 522439, at *16 (Tenn. Ct. App. Jan. 31, 2020).

In *In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018), a panel of this Court interpreted "and" as requiring a party to prove that a parent failed to manifest both an ability and a willingness. Under this interpretation, if a party proves only the "ability" criterion or the "willingness" criterion, the requirements of the statute are not met, and this ground may not serve as a basis for terminating parental rights. *Id.* We believe the interpretation found in *In re Ayden S.* is more consistent with the intent of the General Assembly.

Applying the interpretation in *In re Ayden S.*, Petitioner must prove by clear and convincing evidence that Father failed to manifest *both* an ability and willingness to personally assume legal and physical custody of the child or that he failed to manifest an ability and willingness to personally assume financial responsibility for the child. When evaluating ability, we focus "on the parent's lifestyle and circumstances." *Id.* "When evaluating willingness, we look for more than mere words." *Id.* Rather, a parent must have demonstrated willingness "by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child." *Id.*

No. M2019-00342-COA-R3-PT, 2020 WL 1808614, at *5 (Tenn. Ct. App. Apr. 9, 2020). In light of the number of cases in which this ground has been pled since the statute was enacted in 2016, as noted by the separate opinion filed herewith, we believe this is an appropriate issue for our Supreme Court to give guidance.

Applying the framework set forth in *In re Ayden S.*, we examine the record for evidence that Father manifested both an ability and willingness to personally assume legal and physical custody of Isabella.

With respect to this ground, the trial court held:

> In this case, pursuant to Tenn. Code Ann. §§ 36-1-113(g)(2) and 37-2-403(a)(2), the Court finds that there is clear and convincing evidence that Respondent has failed to manifest, by act or omission, an ability and willingness to assume legal and physical custody of the child. Respondent is still incarcerated due to his multiple parole violations for methamphetamine use and failure to report appropriately to parole. Respondent currently resides in a Tennessee Department of Corrections penitentiary and will not be released, due to his decision to deny parole, for approximately eleven months. Respondent testified that he would need an additional six to ten months after his release from prison to get himself in a position where he could take custody of his daughter. There is still a no contact order in place prohibiting all contact between the child and Respondent. Placing the child in Respondent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

To support his position that he has the ability and willingness to assume custody, Father cites to his testimony that he expects to be released from prison in June 2020 and would be able to care for Isabella within six to ten months of his release; that he has a job lined up with a moving company when he is released from prison; and that he has never spanked his child and could properly parent her.

Father does not have the present ability to assume custody of Isabella due to his incarceration; his testimony also makes clear that Father would not have for at least six months following his release date the ability to take physical custody of her. However, a closer question is presented on his willingness to assume custody. The testimony shows that, while on parole, Father contacted DCS to request a home visit to determine if his home was appropriate and also that he was willing to take custody of Isabella in the future. Mr. Ramos testified that Father was cooperative with him and, but for his current incarceration, wanted to get custody of Isabella. Father's behavior shows that he attempted to overcome one of the obstacles that prevented him from assuming custody; nevertheless, while on parole at two different times, he engaged in conduct that violated his parole, and as a result he was reincarcerated. As being incarcerated was one of the impediments to having custody of Isabella, his failure to abide by the terms of his parole is evidence of a lack of willingness to assume custody of her. Taking all these matters into consideration, we conclude that the record contains evidence of Father's willingness to assume custody of Isabella. Given the need to prove, by clear and convincing evidence, that Father had failed to manifest *both* an ability and a willingness to assume

- 18 -

custody, DCS failed to prove this ground by clear and convincing evidence.[10]

Having concluded that two grounds for termination of Father's rights were proven by clear and convincing evidence, we turn to the question of whether termination was in Isabella's best interest.

### C. Best Interest

Once a ground for termination has been proven by clear and convincing evidence, the trial court must determine whether it is in the best interest of the child for the parent's rights to be terminated, again using the clear and convincing evidence standard. *In re Valentine*, 79 S.W.3d at 546. The Legislature has set out a list of factors at Tennessee Code Annotated section 36-1-113(i) for the courts to follow in determining the child's best interest.[11] The list of factors in the statute "is not exhaustive, and the statute does not

---

[10] While we have found that the first prong of this ground was not proven, we have reviewed the evidence relative to the second prong; in so doing, we are guided by the holding in *Ray v. Ray*:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted). This Court has determined that "placing a child with a parent who ha[s] knowingly engaged 'in repeated criminal conduct that necessitated [the parent's] re-incarceration' would place the child at risk of physical or psychological harm." *In re Amynn K.*, 2018 WL 3058280, at *15 (citing *In re Ke'Andre C.*, No. M2017-01361-COA-R3-PT, 2018 WL 587966, at *11 (Tenn. Ct. App. Jan. 29, 2018), *no perm. app. filed*). The evidence presented by DCS showed that, over the course of Isabella's 21 months in DCS custody, Father was reincarcerated twice for parole violations. Additionally, the unrebutted testimony of Mr. Ramos was that Father's home, as it stood at the time Father was on parole, was not safe or suitable for housing a child. We thus conclude that there is clear and convincing evidence that placing Isabella in Father's custody would pose a risk of substantial harm to her physical and psychological welfare.

[11] The factors at Tennessee Code Annotated section 36-1-113(i) are:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> > (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> > (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time

require every factor to appear before a court can find that termination is in a child's best interest." *In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *Tenn. Dept. of Children's Svcs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)). As we consider this issue we are also mindful of the following instruction in *White v. Moody*:

> [A]scertaining a child's best interests in a termination proceeding is a fact-intensive inquiry requiring the courts to weigh the evidence regarding the statutory factors, as well as any other relevant factors, to determine whether irrevocably severing the relationship between the parent and the child is in the child's best interests. The child's best interests must be viewed from the child's, rather than the parent's, perspective.

171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004) (internal citations and footnote omitted). The Tennessee Supreme Court has explained:

> Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's

---

that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.,* 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child...." Tenn. Code Ann. § 36-1-101(d) (2017).

*In re Gabriella D.*, 531 S.W.3d 662, 681–82 (Tenn. 2017).

The trial court made the following findings in considering Isabella's best interests, which relate to statutory factors (1), (2), (3), (4), (5), (7), and (9), and which we have identified accordingly:

[(1)] Respondent has not made changes in his conduct or circumstances that would make it safe for the child to go home. Respondent is still incarcerated. When Respondent did have the opportunity to be out on parole and in the community, he still chose to use methamphetamine and violate the terms of his parole by failing to report.

[(2)] Respondent has not made lasting changes in his lifestyle or conduct after reasonable efforts by the state to help, so that lasting change does not appear possible. Despite help from the state like referring or otherwise providing opportunities for the following: alcohol and drug assessment, mental health assessment, parenting assessment, ongoing case management, and appropriate care and supervision of the child, for twenty-one months, he still has not demonstrated sobriety when not incarcerated, has not demonstrated good parenting skills and is incarcerated.

[(3)] Respondent has not maintained regular visitation with the child.

[(4)] There is no meaningful relationship between the child and Respondent.

[(5)] Changing caregivers at this stage of the child's life will have a detrimental effect on her. The child has made tremendous progress in her placement and would be devastated if removed from that environment in which she is thriving.

[(7)] There is crime in Respondent's home.

[(7)] Respondent has abused methamphetamine, rendering him consistently unable to care for the child in a safe and stable manner

[(9)] Respondent has not paid child support consistently.

[(5)] The child has established a strong bond with her foster parents, who wish to adopt her.

Father takes issues with many statements the court made in the course of its oral

ruling; a court speaks through its orders, however, and not through oral statements that are not incorporated into an order. *In re Navada N.*, 498 S.W.3d 579, 594 (Tenn. Ct. App. 2016). The comments made by the court during its oral ruling and referenced in Father's brief are not part of the order, as the trial court did not incorporate its oral ruling into the final order. We have reviewed the entire record, giving careful consideration to all of the testimony cited by Father in his brief; we conclude that the record does not preponderate against the findings of the trial court quoted above, with two exceptions. Although there is testimony about the deplorable appearance of the exterior of Father's home, there is no proof that criminal activity took place in the home; also, there is no proof of whether Father paid child support.

While Father attempted at trial and again on appeal to shift much of the responsibility of reunifying him with Isabella to the Department, the evidence shows clearly that he would not be ready to parent her until an uncertain time in the future. Father has not parented Isabella since 2014, when he was placed under the no contact order; he has been in and out of incarceration since that time. During the times he has been on parole, he did not petition to have the no contact order lifted or visitation reinstated; there is no evidence that he has established a meaningful relationship with her. Meanwhile, Isabella has been placed in a stable home with a family who would like to adopt her should she become available. She is doing well physically, academically, and socially. The findings are supported by the evidence and, viewed from Isabella's perspective, amount to clear and convincing evidence that termination of Father's rights is in her best interest.

## IV. CONCLUSION

For the foregoing reasons, we reverse the trial court's holding that clear and convincing evidence established the ground of failure to manifest an ability and willingness to assume custody of Isabella; in all other respects, the judgment is affirmed.

_____
RICHARD H. DINKINS, JUDGE